Brent R. Cohen, Wyo. Reg. No. 5-2008
Chad Caby, *Admitted Pro Hac Vice*
ROTHGERBER JOHNSON & LYONS LLP
1200 17th Street, Suite 3000
Denver, CO 80202-5855
Telephone: 303.623.9000
Facsimile: 303.623.9222
bcohen@rothgerber.com
ccaby@rothgerber.com

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BBB ACQUISITION, LLC | ) | Case No. 10-21002 |
| | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

### [PROPOSED*]DISCLOSURE STATEMENT FOR DEBTOR'S
### AMENDED PLAN OF REORGANIZATION DATED SEPTEMBER 20, 2011

**\*[NOTE: This Disclosure Statement has not yet been approved by the Court and is being furnished at this time solely for the purpose of evaluating whether it contains adequate information pursuant to the Bankruptcy Code. Bracketed materials will be deleted once the Disclosure Statement has been approved by the Court.]**

BBB Acquisition, LLC, Debtor and Debtor-in-Possession in the above-captioned case ("Debtor"), filed its Amended Plan of Reorganization dated September 20, 2011 ("Plan") with the United States Bankruptcy Court for the District of Wyoming in the above-captioned proceeding. Pursuant to the terms of the United States Bankruptcy Code, this Disclosure Statement for Debtor's Amended Plan of Reorganization Dated September 20, 2011 (hereinafter "Disclosure Statement") has been presented to and approved by the Bankruptcy Court. Approval of the Bankruptcy Court is required by statute but does not constitute a judgment by the Court as to the desirability of the Plan or as to the value or suitability of any consideration offered under the Plan.

The Plan and Disclosure Statement contain many defined terms, identified by the use of initial (first letter) capitalization. Unless otherwise expressly defined herein, initially capitalized terms used herein and in the Plan shall have the meaning ascribed to them in the Plan. In the

case of any perceived or actual conflict between anything in this Disclosure Statement and the Plan, the Plan shall control.

The Debtor has prepared this Disclosure Statement to provide information sufficient to permit a creditor to make a reasonably informed decision in exercising the right to vote upon the Plan. The material here presented is intended solely for that purpose and solely for the use of known creditors of the Debtor, and, accordingly, may not be relied upon for any purpose other than determination of how to vote on the Plan.

*VOTING*: **IN ORDER TO VOTE ON THE PLAN, A CREDITOR ASSERTING A CLAIM AGAINST THE DEBTOR MUST HAVE FILED A PROOF OF CLAIM OR INTEREST AT OR PRIOR TO THE BAR DATE, UNLESS SUCH CREDITOR HAS BEEN SCHEDULED BY THE DEBTOR AS HAVING A CLAIM WHICH IS UNDISPUTED, LIQUIDATED, AND NOT CONTINGENT. ANY CREDITOR HAVING A CLAIM WHICH IS SCHEDULED AS UNDISPUTED, LIQUIDATED, AND NOT CONTINGENT IS, TO THE EXTENT SCHEDULED, IS DEEMED TO HAVE FILED A CLAIM, AND, ABSENT OBJECTION, SUCH CLAIM IS DEEMED ALLOWED. YOU ARE ADVISED TO REFER TO THE SCHEDULES ON FILE WITH THE CLERK OF THE BANKRUPTCY COURT TO DETERMINE THE EXTENT TO WHICH YOUR CLAIM IS SCHEDULED AND IF IT IS DISPUTED, UNLIQUIDATED, OR CONTINGENT.**

**A CREDITOR MAY VOTE TO ACCEPT OR REJECT THE PLAN BY FILLING OUT AND MAILING THE BALLOT WHICH IS PROVIDED WITH THIS DISCLOSURE STATEMENT TO: ROTHGERBER JOHNSON & LYONS LLP, ATTN: BRENT R. COHEN, ESQ., 1200 SEVENTEENTH STREET, SUITE 3000, DENVER, CO 80202-5855**

**THE DEBTOR ENCOURAGES YOU TO VOTE TO ACCEPT THE PLAN.**

The Court has fixed [_____, 2011], as the last date by which ballots must be delivered to Rothgerber Johnson & Lyons LLP. No vote received after such time will be counted. Whether a creditor votes on the Plan or not, such person will be bound by the terms and treatment set forth in the Plan if the Plan is accepted by the requisite majorities of classes of creditors and/or is confirmed by the Court. Absent some affirmative act constituting a vote, such creditor will not be included in the tally. Allowance of a Claim or interest for voting purposes does not necessarily mean that all or a portion of the Claim or interest will ultimately be allowed or disallowed for distribution purposes.

In order for the Plan to be accepted by creditors, a majority in number and a two-thirds in amount of Claims filed or deemed allowed of each class of creditors must vote to accept the Plan. For purposes of determining whether the requisite majorities are achieved, the computation will be based upon the total number of Claims or interests actually voting rather than on the total number of Claims approved and allowed. You are, therefore, urged to fill in, date, sign and promptly mail the enclosed ballot. Please be sure to properly complete the form and legibly identify the name of the claimant.

{00974247 / 1}                                     2

This Disclosure Statement contains a summary of certain provisions of the Plan and certain other documents and financial information. While it is believed that the summaries are fair and accurate and provide adequate information with respect to the documents summarized, such summaries are qualified to the extent that they do not set forth the entire text of such documents, which are controlling in the event of any inconsistency. At the direction of the Bankruptcy Court, this Disclosure Statement also contains estimates as to time, certain anticipated expenses and asset values. While reasonable efforts have been made to be accurate, there can be no representation or assurance that the information contained herein is complete and without error. By their nature, estimates are predictions, taking into account certain assumptions regarding future events. Unanticipated occurrences can have a significant impact on such assumptions and may render estimates inaccurate. Each holder of a Claim or equity interest is urged to review the Plan and the exhibits to this Disclosure Statement in their entirety before casting a ballot.

No representations concerning the Debtor, its business operations, the value of its property or the value of benefits offered to creditors or other parties in interest under the Plan are authorized by the Debtor, other than as set forth in this Disclosure Statement. You should not rely on any representations or inducements made to secure your acceptance or rejection of the Plan that are contrary to the information contained in this Disclosure Statement. Certain of the materials contained in this Disclosure Statement are taken directly from other readily accessible documents or are digests of other documents. While the Debtor has made every effort to summarize the meaning of such other documents, the Debtor urges that any reliance on the contents of such other documents must depend on a thorough review of the documents themselves.

The Debtor firmly believes that the Plan represents the best alternative for providing the maximum value for creditors. Depending upon certain factors more fully discussed in the following pages, it is likely, but by no means certain, that the Plan may provide holders of Claims with a full recovery on account of their Allowed Claims. For the foregoing reasons, among others, the Debtor strongly believes that confirmation of the Plan is in the best interests of creditors and recommends that all creditors entitled to vote on the Plan cast their vote to accept the Plan.

## I.   DEFINITIONS

Each term defined in the Plan shall have the same meaning in this Disclosure Statement. The Plan is attached for reference as **Exhibit A** to this Disclosure Statement.

## II.   PLAN SUMMARY

The following discussion provides a general overview of the Plan and is qualified in its entirety by reference to the detailed information set forth in the Plan, attached hereto as **Exhibit A**. This Disclosure Statement also contains a more detailed description of the Plan.

The Debtor believes that the Plan provides the best method to obtain the maximum value from the Debtor's bankruptcy estate and to make distributions to the creditors. Since the commencement of the case, the Debtor has been actively operating its business. The Debtor has also investigated the affairs and business operations of the Debtor and its principals in accordance with its duties under the Bankruptcy Code.

Generally, the Plan provides for payment to the creditors in accordance with the priorities established by the Bankruptcy Code. Reorganized BBB will conduct its business according to the terms of this Plan and its Operating Agreement in order to achieve a structured and orderly sale of its assets in a fashion that will maximize value to all holders of Claims and Equity Interests. Reorganized BBB will be responsible for administering the Plan and making distributions to the remaining creditors. After approval of the Plan by the Bankruptcy Court and the payment of Allowed Administrative Claims, General Priority Claims and Convenience Claims, Reorganized BBB will continue the operation of its business in the same fashion as it did prior to the Petition Date. A public auction of all remaining real estate and Operating Equipment will be held in 2012. The Members making up the Class 7 Equity Interests in the Debtor will retain their ownership interest. The specifics of the Plan and priorities of the distribution are set forth in more detail in Articles VIII through XI of this Disclosure Statement.

**THE PRECEDING IS MERELY A SUMMARY OF THE PROVISIONS OF THE PLAN AND IS NOT INTENDED AS A SUBSTITUTE FOR READING THE PLAN IN ITS ENTIRETY. PLEASE READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS SUMMARY, OR THIS DISCLOSURE STATEMENT, AND THE PLAN, THE PROVISIONS OF THE PLAN WILL CONTROL.**

## III.   HISTORY OF THE DEBTOR'S BUSINESS AND EVENTS LEADING TO THE FILING OF THE BANKRUPTCY PETITION

### A.   *The Debtor's Business Origins*

In August of 2005, the Debtor purchased certain real property from Max C. Chapman ("Chapman"). The property purchased from Chapman is now known as the Bar-B-Bar Ranch in Teton County, Wyoming (the "Ranch"). As part of the purchase, BBB agreed that within ten (10) years of the date of the agreement, upon the sale of any parcels of real estate within the Ranch, Chapman would be provided with the first right to re-purchase (the "Chapman Right of First Refusal"), up to a maximum of two parcels.

The Ranch is located just south of the Jackson Hole airport on property that was originally part of the historic Moulton homestead. The residential development consists of 16 parcels, each in excess of 35 acres in size, located adjacent to the Snake River. The Debtor was organized as a Wyoming limited liability company and received its Certificate of Organization from the Wyoming Secretary of State on May 27, 2005. It was formed by Mercer Reynolds III, who was designated as the Managing Member. Mr. Reynolds owns 41.5% of the membership interests in the Debtor. Reynolds Partnership, L.P., an affiliate of Mr. Reynolds, owns another

41.5% of the Debtor. Various other family members and affiliates own the remaining membership interest.

## B.    *The Development and Sale of Parcels at the Bar B Bar Ranch*

The parcels within the Ranch are classified as "River" and "Meadows" parcels. The River parcels are all riparian to the Snake River. The Meadows parcels are not, but owners have pedestrian access to the Snake River. After the necessary regulatory approvals were obtained for the creation and development of the Ranch, the parcels were marketed for sale to the public beginning in late 2005. Three of the River Parcels sold in 2006, on the dates and for the prices listed below:

| | | |
|---|---|---|
| 3A and 3B | $21,565,000 | 11/17/06 |
| 4A and 4B | $21,870,000 | 1/19/06 |
| 5A and 5B | $22,700,000 | 1/19/06 |

In each case, the Chapman Right of First Refusal was waived or not exercised. In 2007 and 2008, the Debtor traded certain parcels with Linger Longer West, LLC ("LLW"), an affiliated entity owned by Mercer Reynolds and his children. LLW received parcels 2A and 2B, 7B, and 8A and 8B. The Debtor received parcels 9 and 10. The transaction is referred to herein as the "Exchange". As part of that transaction, LLW agreed to reimburse the Debtor for the pro rata share of improvements made to the parcels it received. Thus, LLW executed three promissory notes in favor of the Debtor for the original principal amounts of $1,711,071.13, $83,235.38 and $59,448.95 (the "LLW Notes"). These obligations remain outstanding. The LLW Notes specify that they are to be paid on demand, with interest accruing at the rate of 4% per annum on the large note and 3% per annum on the two smaller notes. The outstanding principal balance on all three of the LLW Notes was $909,471, as of July 31, 2011.

## C.    *The Dillard Transaction*

G. Douglas Dillard, Jr. ("Dillard") and Michele Dillard, husband and wife are co-trustees of the Dillard Family Trust U/A/D/ 8/6/03 (the "Dillard Trust"). The Debtor and Dillard executed a Contract to Buy and Sell Real Estate, dated August 31, 2007 ("Sale Contract") for the sale of Ranches 1A and 1B, two River parcels within the Ranch. Included in the Sale Contract was "Attachment A," which described a put option contemplated by the parties, relocation of the building envelope and the application for an amendment to the development permit for Ranches 1A and 1B ("PRD Amendment") with Teton County. BBB's Counteroffer, which altered certain terms of the PRD Amendment provision contained in the Sale Contract, was signed by Dillard September 11, 2007.

Closing on Ranches 1A and 1B took place on April 29, 2008. The Chapman Right of First Refusal was waived. Prior to closing, Dillard assigned his rights in the Sale Contract to the Dillard Trust. Two Warranty Deeds representing title to the Ranches 1A and 1B were executed.

The parties also executed the Agreement Regarding Put Option and Right of First Refusal, with attachments ("Put Option Contract"). The Put Option Contract gave Dillard the option of requiring BBB to repurchase Ranches 1A and 1B within 18 months, provided certain conditions were met. As consideration for the purchase of Ranch 1A and Ranch 1B, Dillard paid BBB $15,000,000 in cash and delivered a $1,000,000 Promissory Note ("Note") payable to BBB.

### D.    *The Dillard Litigation*

The Dillard Trust delivered written notice of its exercise of the put option to BBB on December 12, 2008. As of the date that the put option was exercised, the PRD Amendment had not been approved by the County. The put price at that time was $14 million.

On December 15, 2008, the Teton County Planning Department issued a letter, with enclosures, reflecting approval of the PRD Amendment. According to the terms of the Note, Dillard's obligation to pay the remaining $1 million towards the purchase price of Ranches 1A and 1B was triggered within three days of approval of the PRD Amendment. By letter dated December 17, 2008, Dillard notified BBB that he did not intend to pay the Note according to its terms.

BBB filed its complaint in Teton County District Court in April 2009, seeking a declaratory judgment that it had no obligation to repurchase the parcels. BBB also sought a judgment on the Note executed and delivered by Dillard in his individual capacity. The Dillard Trust removed the action to the United States District Court for the District of Wyoming and filed a counterclaim for breach of contract, asserting that it was entitled to specific performance under the Put Option Contract and for damages it claimed as a result of BBB's refusal to buy back Ranches 1A and 1B.

The case was tried to the District Court in March 2010. Pursuant to Findings of Fact and Conclusions of Law dated July 20, 2010, the District Court found that Dillard had defaulted under the Note and that such default was not excused by any conduct of the Debtor. The Court thus entered judgment for the amount of $1,092,451.77 on the Note. The Court further ruled that the default under the Note did not excuse the Debtor from repurchasing Ranches 1A and 1B under the Put Option Contract. The Court granted the Dillard Trust specific performance and ordered the Debtor to repurchase Ranches 1A and 1B for $14 million. This was based on the District Court's finding that it could not determine the fair market value of Ranches 1A and 1B as of the date of the alleged breach of the Put Option Contract, given then existing market conditions. The Court also awarded damages for breach of contract against the Debtor in the amount of $244,102.86. Finally, the Court awarded attorneys' fees and costs to each party and authorized the filing of applications for approval.

After attempts to settle the matter were unsuccessful, BBB and the Dillard Trust filed applications for the recovery of fees and costs in the amount of $434,145.03 and $510,633.23 respectively. BBB also filed a motion for a stay pending appeal. The Court denied the stay. BBB filed its bankruptcy petition shortly thereafter.

The Debtor filed an appeal of the Court's findings to the Tenth Circuit Court of Appeals on July 30, 2010. The Dillard Trust filed a cross-appeal on August 23, 2010. The Debtor and the Dillard Trust are in the process of filing their respective briefs in the appeal and cross-appeal.

On appeal, the Debtor has asserted that the District Court erred in granting specific performance to the Dillard Trust and requested that the Tenth Circuit determine whether: (i) when parties negotiate a contract using multiple documents, all executed contemporaneously, the documents must be considered as a whole; and (ii) the Debtor's termination of the contract between it and the Dillard Trust was legally effective. If the Debtor prevails on appeal, the Dillard Claim would be eliminated entirely and the Debtor would retain its right to recover against Dillard on the Note and recover its attorneys' fees and costs incurred in the Dillard Litigation.

On the other hand, the Dillard Trust, in its Cross-Appeal, has requested that the Tenth Circuit determine whether: (i) the district court erred in determining the repurchase price was $14 million or $15 million; (ii) the district court erred in failing to award prejudgment interest; and (iii) the district court erred in ruling that the Dillard Trust did not assume a $1 million note payment obligation. If the Dillard Trust prevails on appeal, its claim against the Debtor could increase from $14 million, plus attorneys' fees and costs, to in excess of $17 million. As explained below, on June 3, 2011, the Dillard Trust filed an Amended Proof of Claim asserting a secured claim in the amount of $10 million and an unsecured claim in the amount of $7,253,502 for a total claim in the amount of $17,253,502.00.

## IV.   THE DEBTOR'S OPERATIONS AND ACTIONS
## DURING THE CHAPTER 11 CASE

### A.   *Post-Petition Operation and Proceedings*

After the Petition Date, the Debtor continued to operate its business in much the same way it has in the past. It continues to fulfill its obligations to make improvements and market unsold parcels of property at the Ranch. Due to the severe economic downturn that began in late 2008, there were no sales in 2009. Ranch 7A, which is subject to a conservation easement, sold during 2010 for $1.6 million. Of this amount, $200,000 has been placed in escrow pending BBB's completion of certain improvements at the Ranch. It is anticipated that these will be completed by the fall of 2011. If they are not completed by December 1, 2011, the funds in the escrow account will revert to the purchaser of Ranch 7A.

Directly after the Petition Date, the Debtor moved for approval of RJ&L as its counsel for purposes of the bankruptcy case and the Litigation. The Bankruptcy Court entered an Interim Order authorizing RJ&L's retention on September 17, 2010. The Debtor requested authority from the Bankruptcy Court to retain the Wylie Firm in Jackson Wyoming as its special real estate counsel and Jean Whitford as its bookkeeper and accountant. The Debtor also filed a motion establishing a claim bar date. The Bankruptcy Court entered an order setting November 28, 2010, as the last day to file proofs of claim.

Dillard and the Dillard Trust filed a motion seeking relief from the automatic stay on October 21, 2010, so that all post-trial motions pending before the District Court could be resolved in the Dillard Litigation and the parties could proceed with the appellate process. The Debtor agreed to stipulate to relief from stay for the limited purpose of allowing the District Court to decide the pending motions for attorneys' fees and costs and allowing all appeal proceedings to go forward in the Tenth Circuit. The Debtor objected to the Dillard Trust's request that it be allowed to pursue other post-judgment remedies in the District Court. On August 30, 2011, the Bankruptcy Court entered its Order on Dillard Trust's Second Supplement to Motion for Relief From Stay, denying without prejudice the Dillard Trust's request to pursue in the District Court an order converting the specific performance order to a money judgment, an award of additional real estate taxes and home owners association fees and an award of prejudgment interest. In the same Order, the Court denied the Dillard Trust's request to seek post-petition attorney's fees in the District Court.

In addition, the Dillard Trust and the United States Trustee have filed motions to convert the Debtor's Chapter 11 case to a case under Chapter 7. The Debtor filed responses to both motions and the Court heard testimony on the matter on June 1-2, 2011. On September 16, 2011, the Bankruptcy Court entered separate orders denying the motion to convert, without prejudice.

### B.    *Real Estate Values*

Sotheby's Realty has been the Debtor's real estate broker since the Ranch parcels were initially put on the market and has been approved as the Debtor's broker by the Bankruptcy Court. Current listing prices and 2008 appraised values for the remaining parcels are as follows:

| Parcel | Listed Price | Appraised Value |
|---|---|---|
| 6A | $8,400,000 | $9,600,000 |
| 6B | $6,950,000 | $7,900,000 |
| 9 | $15,000,000 | $18,500,000 |
| 10 | $13,000,000 | $18,500,000 |
| **Total** | $43,350,000 | $54,500,000 |

There is a significant amount of uncertainty regarding the current fair market value of the foregoing parcels. During the course of the Dillard Litigation, each side offered expert appraisal reports into evidence with respect to the fair market value of Ranches 1A and 1B, which are similar to Ranches 9 and 10 in terms of size and location. BBB offered the report of Steven A. Hall, MAI, who opined that Ranches 1A and 1B had a fair market value of $16 million as of January 2010. The Dillard Trust offered the report of Tim J. Bradley, MAI, dated November 10, 2009, who concluded as follows:

Based on the assumptions, data, and analysis contained in the
appraisal report, it is my opinion that the values of the fee simple
estate of the subject property as of the dates and conditions shown
below are:

| | |
|---|---|
| Market Value as of January 26, 2009: | $14,500,000 |
| Forced Sale Value as of January 26, 2009: | $9,425,000 |
| Market Value as of November 6, 2009: | $12,300,000 |
| Forced Sale Value as of November 6, 2009: | $8,000,000 |

*There were very few transactions in the Jackson Hole market
between April 2008 and January 2009, and only one sale of a
large vacant residential parcel. The paucity of data, when
combined with the market turmoil and uncertainty, create a
situation in which the reliability of any appraisal of this property
as of January 2009 will be reduced. Somewhat more data is
available for the November 2009 valuation, and greater
confidence may be had in that value conclusion.* (Original
emphasis.)

It should be noted that the "somewhat more data" referred by Mr. Bradley did not include any
comparable sales.

As indicated above, the District Court in the Dillard Litigation ruled that Ranches 1A and
1B could not be valued on the basis of appraisal testimony regarding the status of the market in
early 2010. Specifically, the District Court found as follows:

The Court begins with the uncontroversial premise that, even in the
best of times, the market for real property like lots 1A and 1B was
a small one, and it frequently took considerable time to sell these
parcels. The Court is well aware of the economic conditions that
existed at the operative time periods, that is, December 12, 2008
onward. These conditions, notably the frozen credit markets and
the reluctance of many institutions to lend money, further affect
this small market. Experts have opined about the "value" of these
parcels at various points in time, but these opinions are, at best,
educated guesses. They use comparable sales, but these sales did
not occur under the same conditions as the time period at issue.
They made a valiant effort to account for all possible variables, but
the Court remains convinced that the margin of error is simply too
large to permit any rational finding of value at any of the relevant
times.

There have been no sales at the Bar-B-Bar Ranch since the sale of Ranches 1A and 1B in April 2008. Consequently, there are no recent sales which would serve as reliable comparables. The listing prices shown above are based on BBB's best judgment, after consultation with its listing broker, of that amount which will bring an offer within an acceptable range. The listing price for Ranch 9 was reduced from $23.8 million to $15 million in October 2010. The listing price for Ranch 10 was reduced from $17.34 million to $13 million at the same time. The market for properties of this nature has softened considerably since the onset of the recession in late 2008. BBB viewed the 2011 selling season as an opportunity to generate additional sales and develop a better understanding of current fair market values. As of the filing of this Disclosure Statement, no offers have been received by BBB for the purchase of any of its parcels. Further reductions of listing prices may be required. The Dillard Trust claims that the value of Ranches 1A and 1B was recently appraised at $10 million. However, the Dillard Trust has not provided a copy of the purported appraisal to BBB.

### C.    *LLW Settlement*

In the Dillard Family Trust's Objection to BBB's First Disclosure Statement, filed on December 28, 2010, it was argued that the property conveyed by BBB in the Exchange was significantly more valuable than what BBB received, suggesting that the Exchange was potentially avoidable as a fraudulent conveyance. After this allegation was made, BBB reviewed listing and appraisal information indicating that the values for the respective parcels of land were roughly equivalent at the time of the Exchange between LLW and BBB. The appraisal information also demonstrated that, shortly after the Exchange, BBB was left with approximately $70 million in real estate value against debts in the approximate amount of $34 million. Accordingly, it was determined that no grounds exist to suggest that BBB was rendered insolvent by virtue of the Exchange. BBB thus concluded that no claim or avoidance action was created by the Exchange and that any claim, if asserted, would be groundless.

In early 2011, LLW received an offer for the purchase of Ranches 2A, 2B and 8A in the approximate amount of $30 million. When the buyer learned of the statements made by the Dillard Trust in its objection to BBB's Disclosure Statement, it insisted on a final, non-appealable order from the Bankruptcy Court indicating that the transaction could proceed without any surviving condition or claim by BBB's bankruptcy estate. It was thus proposed that, in exchange for a release of the purported fraudulent conveyance action, LLW would pay BBB $1 million of the sales proceeds. Fifth Third Bank agreed to release its lien and security interest in the $1 million and authorize the payment. The payment was to be applied towards indebtedness owed BBB by LLW. The arrangement was memorialized in a settlement agreement. On May 14, 2011, BBB filed its Motion for Approval of Settlement Agreement with Linger Longer West, LLC (the "Settlement Motion").

In the meantime, the attorney representing the prospective purchaser of the LLW parcels contacted James Belcher, counsel for the Dillard Trust, expressing his client's desire to conclude the transaction within an abbreviated timeframe and soliciting cooperation with respect to the proposed settlement. Such assurances were not forthcoming from the Dillard Trust. Unable to

overcome the potential title issues and failing to obtain assurances from the Dillard Trust, the potential buyer withdrew its offer for Ranches 2A, 2B and 8A. On May 27, 2011, BBB filed a Supplement to Motion for Approval of Settlement Agreement with Linger Longer West, LLC (the "Supplement"). The Supplement advised parties in interest and the Court that the prospective purchaser of the LLW property had withdrawn its offer to purchase the property.

On June 6, 2011, Dillard Trust filed an objection to the Settlement Motion (the "Objection"). The Objection asserted the Settlement Motion improperly attempted to clear title to an asset owned by LLW, and not BBB, and that there existed no consideration for the settlement agreement. With no pending sale of the LLW property, BBB subsequently elected to withdraw the Settlement Motion.

LLW anticipates receiving a second offer to purchase Ranches 2A and 2B, and perhaps certain additional parcels. Prospective purchasers of Ranches 2A and 2B have expressed concern regarding the Dillard Trust's allegations of a potential fraudulent conveyance claim arising from the Exchange. After continued negotiations, BBB, LLW and Fifth Third Bank have reached an agreement under which all issues relating to the Exchange have been resolved, subject to Bankruptcy Court approval. On August 12, 2011, BBB filed a Motion for Approval of Revised Settlement Agreement With Linger Longer West, LLC. The objection deadline was September 6, 2011. The Dillard Parties have filed an objection to the motion. The Settlement Agreement provides in pertinent part that:

> (a)    LLW will pay BBB up to $1 million from the proceeds of the sale of Ranches 2A and 2B (the "Settlement Funds") at such time as a sale occurs. Such payment will be credited against the current outstanding balance on the LLW Notes. The unpaid balance of the LLW Notes, less the Settlement Funds, will remain outstanding. In addition, LLW will pay BBB $100,000 immediately upon Bankruptcy Court approval. Such payment is not contingent upon the sale of Ranches 2A and 2B. The payment of the $100,000 will not be applied against the LLW Notes, but will be paid solely in consideration for release of potential claims related to the Exchange.

> (b)    Upon receipt of the $100,000, BBB will grant LLW a release of any and all claims, including avoidance claims, arising out of the Exchange. The release will not include the remaining balance, if any, owed on the LLW Notes.

> (c)    Fifth Third Bank, in its capacity as a secured creditor of LLW, will consent to the payment of the Settlement Funds, and will release any lien or security interest in the Settlement Funds.

By granting a release of what is considered a groundless avoidance claim, BBB will receive a cash payment of $100,000 and as much as $1 million that would otherwise be subject to Fifth Third Bank's lien. This confers a significant benefit upon the bankruptcy estate.

## V.   THE DEBTOR'S MEMBERS AND OFFICERS

### A.   *Member Background Information*

Mercer Reynolds III is the managing member of the Debtor and personally holds a 41.5% interest in the Debtor.  Mr. Reynolds has wide-ranging experience in the fields of investing and real estate development.  Mr. Reynolds has personally guaranteed the Fifth Third Loans.  He receives no compensation from the Debtor as the Managing Member.  Finally, any potential avoidance claims against Mercer Reynolds will be preserved pursuant to a Tolling Agreement, attached as Exhibit 1 to the Plan.  Under the Tolling Agreement, if the Plan is unsuccessful, Reorganized BBB or any successor trustee will have the right to bring any avoidance actions against Mercer Reynolds at least one year after conversion to a Chapter 7 proceeding or dismissal of the Debtor's bankruptcy case.  *See Article VII, Potential Avoidance and Litigation Claims.*

## VI.   PRINCIPAL ASSETS AND FINANCIAL PERFORMANCE OF BBB

As a real estate development company, the Debtor generates revenue primarily through the sale of real property at the Ranch.  It also received payments on the LLW Notes.  The Debtor also owns the Operating Equipment, which is utilized in its day-to-day operations.

The Debtor's Balance Sheet and Profit and Loss Statement as of August 31, 2011 are attached as **Exhibit B**.  The liabilities reflected on **Exhibit B** do not necessarily conform to the Claims that have been filed in the Debtor's bankruptcy case.  For instance, the Dillard Trust Claim in the amount of $17,253,502.00, which is Contested, is not reflected on the Balance Sheet.

The Plan provides that the Debtor will continue to market and sell real estate at the Ranch.  All unsold parcels owned by BBB will be sold at public auction in 2012, as described below.

After payment of all secured claims, proceeds generated from the sale of parcels at the Ranch shall be available for the distribution to creditors holding General Unsecured Claims.

## VII.   POTENTIAL AVOIDANCE AND LITIGATION CLAIMS

The Debtor has conducted an analysis of payments made to creditors within ninety days of the filing of its bankruptcy petition and to insiders within the twelve-month period prior to the filing of the bankruptcy petition.  On the basis of this analysis, the Debtor has determined that $234,634.38 in payments are potentially avoidable as preference payments under Section 547 of the Bankruptcy Code.

Within one year prior to the Petition Date, the Debtor made two payments to Mercer Reynolds III on an unsecured loan in the amount of $133,900 and $78,839.06, respectively.  In addition, the Debtor has made two interest payments two Fifth Third Bank totaling $21,895.32

on a loan made to certain members of the Debtor, including Mercer Reynolds, the proceeds of which were used to fund the Debtor's operations. The Debtor has investigated the viability of these potential claims and available defenses, along with the likely cost of litigation and the likelihood of collection in the event the potential claims are reduced to judgment. The parties have concluded that it is in the best interests of the Debtor and the bankruptcy estate to simply preserve the claims through the execution of a Tolling Agreement, which is attached and incorporated into the Plan as Exhibit 1. In the event that the Allowed Class 5 Claims are paid in full, as provided under the Plan, the potential claims against Mr. Reynolds will be rendered moot. If the Plan is unsuccessful, either the Debtor or a successor to the Debtor will have the ability to bring the claims at least one year after conversion to a Chapter 7 proceeding or dismissal of the Debtor's bankruptcy case.

BBB does not believe that the Exchange gives rise to an avoidance claim. The prosecution of any such claim would be unwarranted.

As indicated above, the Debtor filed an appeal of the District Court's findings to the Tenth Circuit Court of Appeals and the Dillard Trust has filed a cross-appeal. It is difficult to predict how long it will take for these appeals to be resolved. According to the Practitioners' Guide to the United States Court of Appeals for the Tenth Circuit, published by the Office of the Clerk, United States Court of Appeals for the Tenth Circuit Court of Appeals and revised as of July 2010:

> During fiscal 2008 the median time from filing the notice of appeal to entry of a decision was 10.9 months. This is faster than the median time for the majority of circuits. This circuit hears most criminal appeals as soon as they are fully briefed. Civil appeals without priority can, however, take longer. The court has taken some extraordinary steps to speed up the appellate process, but delay remains a factor to consider in civil cases.

Currently, the Debtor and the Dillard Trust are in the process of filing their respective briefs in the appeal and cross-appeal. Based on amounts that have been incurred thus far, attorneys' fees associated with the appeal and cross-appeal are estimated to range from $50,000 to $65,000.

## VIII.   CLASSIFICATION OF CLAIMS AND INTERESTS

### A.   *Administrative Claims*

As provided by Section 1123(a)(1) of the Bankruptcy Code, Administrative Claims shall not be classified for purposes of voting or receiving distributions pursuant to the Plan. Rather, all such claims shall be treated separately as unclassified claims. Administrative Claims will likely consist of fees owing to the United States Trustee and the Debtor's professionals. The Debtor is not aware of any other Administrative Claims.

{00974247 / 1}                                    13

Allowed Administrative Claims, which include fees owing to the United States Trustee pursuant to 28 U.S.C. § 1903(a)(6), will be paid by Reorganized BBB on the Distribution Date of the Plan. In the unlikely event that Reorganized BBB is without sufficient cash to pay all Allowed Administrative Claims, they will be paid from the Creditor Fund before any distributions are made to the other classes of Claims.

All persons claiming fees from the estate will be required to file final fee applications with the Bankruptcy Court within sixty (60) days after the Effective Date. In the event an objection to a fee claim is timely filed and served, it will be treated as a contested claim until resolved by Final Order of the Bankruptcy Court.

United States Trustee Fees have been paid during the pendency of the Chapter 11 case and will be paid through the Effective Date by the Debtor. After the Effective Date, such fees shall be paid by Reorganized BBB until the Chapter 11 case is closed, converted or dismissed.

**B.     *Claims and Equity Interests Classified***

Claims and equity interests are classified in the Plan pursuant to Section 1122(a) of the Bankruptcy Code as follows:

| | |
|---|---|
| Class 1 | General Priority Claims |
| Class 2 | Secured Claim of Fifth Third Bank |
| Class 3 | Claim of the Dillard Trust |
| Class 4 | Convenience Claims |
| Class 5 | General Unsecured Claims |
| Class 6 | Contingent Contractor Claims |
| Class 7 | Membership Interests |

## IX.   TREATMENT OF CLAIMS NOT IMPAIRED UNDER THE PLAN

Classes 1, 4 and 7 are not impaired under the Plan. Accordingly, these Classes shall be deemed to have accepted the Plan as provided in Section 1126(f) of the Bankruptcy Code.

The Class 1 Allowed General Priority Claims shall receive from the Debtor, no later than the Distribution Date, a cash payment equal to the Allowed General Priority Claim. The Debtor is not presently aware of any General Priority Claims.

Holders of Class 4 Convenience Claims shall receive Cash in an amount equal to their Allowed Claims, without interest, not exceeding $2,500 on the Distribution Date. Each holder of

an Allowed General Unsecured Claim which elects to reduce its Allowed General Unsecured Claim to $2,500 and participate in Class 4 treatment shall be deemed to have waived any right to participate in any distribution to any Class as to any Claims it may have. The Debtor estimates that payments to Class 5 creditors will be approximately $6,225. Class 4 is not impaired.

The holders of Class 7 membership interests shall retain their interests in the Debtor and the legal, equitable and contractual rights of such holders shall not be affected by this Plan, but only upon satisfaction of all Allowed Claims according to the terms of the Plan. No distributions will be made on the account of Class 7 Membership Interests until such time. The Members' Class 7 interests are unimpaired under the Plan.

## X.    TREATMENT OF CLASSES IMPAIRED UNDER THE PLAN

### A.    Class 2: Secured Claim of Fifth Third Bank

Class 2 consists of the secured claim of Fifth Third Bank, which filed a Proof of Claim on November 19, 2010 for $21,300,343.27. The holder of the Allowed Class 2 Claim of Fifth Third Bank shall be paid as follows:

1. The principal amount of the claim shall be fixed at either: (i) the amount of the claim as set forth in the Class 2 Proof of Claim; (ii) an amount agreed upon by the parties; or (iii) an amount determined by the Court. As of the filing of the Petition Date, the principal balance owed on the Fifth Third Loan was $21,300,343.27.

2. The Allowed Class 2 Claim will bear interest at the rate of 30-day LIBOR plus 2.5 % per annum, commencing on the Effective Date of the Plan.

3. The Allowed Class 2 Claim shall remain secured by the Fifth Third Collateral according to the terms of the Mortgage. Fifth Third Bank's rights under the Mortgage are preserved, except as expressly modified herein.

4. Reductions of the amount of the Allowed Class 2 Claim shall be made from the Net Sales Proceeds of the Fifth Third Collateral.

5. During Calendar Year 2012, Reorganized BBB shall conduct a public auction of its real estate and Operating Equipment. Fifth Third Bank shall be entitled to credit bid the full amount of the Allowed Class 2 Claim at the auction of the Fifth Third Collateral.

### B.    Class 3: The Claim of the Dillard Trust

The claim held by the Dillard Trust is currently disputed by the Debtor and is subject to litigation. Therefore, the claim of the Dillard Trust will not be paid and will not constitute an Allowed Class 3 Claim until after it is allowed in some amount by the appropriate court and becomes an Allowed Claim.

{00974247 / 1}                                                        15

The District Court ordered BBB to repurchase Ranches 1A and 1B for $14 million within forty-five days of July 2, 2010. BBB was without the financial resources to comply prior to the filing of its bankruptcy petition. Presently, record title to Ranches 1A and 1B remains in the Dillard Trust. From a legal perspective, the nature of BBB's interest in Ranches 1A and 1B is not entirely clear. There are no specific provisions of the Bankruptcy Code that define a debtor's rights in a specific performance judgment. Nor can any relevant bankruptcy case law be located. As of the filing of the Bankruptcy Petition, it was the position of the Dillard Trust that BBB's obligation to purchase Ranches 1A and 1B remained outstanding. Conversely, BBB maintains the right to purchase Ranches 1A and 1B for $14 million. It thus has an equitable interest in Ranches 1A and 1B to that extent. This right could potentially be of value should a third party offer to purchase Ranches 1A and 1B for an amount in excess of $14 million. At present, BBB is unaware of the existence of any prospective purchaser of Ranches 1A and 1B. The Dillard Trust filed a Proof of Claim asserting an unsecured claim on October 7, 2010 in the amount of $17,253,502.00. Thereafter, the Dillard Trust amended its proof of claim twice, the first time on May 3, 2011 and then on June 3, 2011. The June 3, 2011 Amended Proof of Claim asserts a secured claim in the amount of $10 million and an unsecured claim in the amount of $7,253,502 for a total claim in the amount of $17,253,502.00. BBB has been provided no support for the Dillard Trust's valuation of its secured claim or how a judgment for specific performance can be treated as a secured claim. Moreover, the amendment of the original proof of claim was made well after the Bar Date and would likely be considered invalid. Nevertheless, as an accommodation to the Dillard Trust, the Plan specifies that all legal and equitable title to Ranches 1A and 1B will vest in the Dillard Trust free of any claim or interest asserted by the Debtor and reduces the Dillard Claim by the value of Ranches 1A and 1B in an amount to be established by the Bankruptcy Court or by agreement of the parties. The Plan further provides that the Dillard Trust will have a General Unsecured Claim to the extent the Allowed Claim exceeds the value of Ranches 1A and 1B as of the filing of the Petition Date.

The Class 3 Claim will be treated and paid as follows:

1.    The amount of the Class 3 Claim shall be fixed at either: (i) the amount of the claim as set forth in the Class 3 Proof of Claim taking into account the Dillard Trust's interest in estate property pursuant to the provisions of Section 506 of the Bankruptcy Code; (ii) an amount agreed upon by the parties; or (iii) an amount determined by the appropriate court.

2.    The holder of the Allowed Class 3 Claim shall retain title to Ranches 1A and 1B free and clear on any interest of BBB, legal or equitable, created by the judgment entered in the Dillard Litigation.

3.    At such time as the Claim of the Dillard Trust becomes an Allowed Claim, if at all, it shall be reduced by the value of Ranches 1A and 1B. Such value shall be determined in an amount to be stipulated by the parties or determined by the Bankruptcy Court. Any portion of the Dillard Claim in excess of the established

value of Ranches 1A and 1B shall be treated as a General Unsecured Claim under Class 5

## C.      Class 5: General Unsecured Claims

Creditors holding Allowed Class 5 Claims will receive their Pro Rata share of distributions on a quarterly basis from the Creditor Fund after payment of Allowed Administrative Claims, Allowed General Priority Claims, Allowed Convenience Class Claims and the Allowed Fifth Third Claim until paid in full, plus simple interest at the rate of 4% per annum, calculated from the Petition Date. Payment on Allowed Class 5 Claims will be made from funds generated from the sale of real estate within the Ranch, along with the sale of the Operating Equipment. Creditors whose claims fall within Class 5 are shown on the Schedule of Unsecured Creditors, attached hereto as Exhibit C. Class 5 is impaired.

## D.      Class 6: Contingent Contractor Claims

On October 25, 2010, the Debtor filed an Amended Schedule F, which reflects claims arising out of services contracted for, but not used, in 2010. The designated creditors were Jorgensen Associates, Pierson Land Works, Quill Creek Excavation, LLC and Yellow Iron Excavating, LLC. It now appears that none of these creditors intends to assert a claim arising out of these contracts. For this reason, they have been classified as Contingent Contractor Claims. Each of the Contingent Contractor Claims has been designated as such on the Schedule of Unsecured Creditors, attached hereto as Exhibit C.

Creditors holding Class 6 Claims will not receive any distribution on account of their Claims under the Plan. To the extent any holder of a Class 6 Claim files a Proof of Claim with the Court prior to the Effective Date, the Claim will be treated as a Contested Class 5 Claim. Class 6 is impaired.

## E.      Treatment of Executory Contracts

A review of applicable case law reveals a split among courts as to whether a right of first refusal recorded against a parcel of real estate in Wyoming is considered an executory contract, subject to treatment under Section 365 of the Bankruptcy Code, or a recorded encumbrance against the subject real estate. In order to avoid litigation and the potential additional claims associated with rejection of the Chapman Right of First Refusal, BBB has determined that, on the Effective Date of the Plan, the BBB will treat the Chapman Right of First Refusal as an executory contract and assume it. Given BBB's previous experience with sales of its parcels, it is not believed that the existence of the Chapman Right of First Refusal will impair BBB's ability to sell real estate or otherwise adversely impact sale prices. All other unexpired leases and executory contracts between the Debtor and any other Person (if any) which have not prior to the Effective Date of the Plan been affirmatively assumed by the Debtor, will be deemed rejected.

## XI.    MEANS FOR THE IMPLEMENTATION AND EXECUTION UNDER THE PLAN

### A.    Operation of Reorganized BBB.

Reorganized BBB shall continue to operate, funding the Creditor Fund as required, making distributions on Allowed Claims as provided in the Plan and seeing to the closing of the Chapter 11 case. Reorganized BBB shall retain, may enforce and may prosecute all causes of action for the benefit of the estate, as successor to the Debtor, all pursuant to Section 1123(b)(3)(B) and 1145(a)(1) of the Bankruptcy Code. Reorganized BBB shall fund all costs and expenses of prosecuting any of its claims and causes of action that, in its sole and absolute discretion, appear to be reasonably likely to yield funds to Reorganized BBB. This includes the Dillard Litigation. Costs and expenses of litigation incurred by Reorganized BBB shall be treated as Operating Expenses. The amount remaining after payment of attorneys' fees and the costs and expenses it incurs in prosecuting its claims shall be added to the Creditor Fund and distributed in the same manner as funds generated from operations. Reorganized BBB shall continue to make such distributions until all Claims have been paid in full, with interest.

### B.    Funding of the Plan.

The Debtor shall continue its present business following the Confirmation Date and will continue to operate as Reorganized BBB following confirmation. Total post-petition expenses as of August 31, 2011 are shown on the Profit and Loss Statement included in **Exhibit B**. On the Distribution Date, the Debtor estimates that it will require approximately $250,000 to $350,000 to pay remaining unpaid Administrative Expenses, General Priority Claims and Convenience Claims. Such funds will come from cash on hand on the Distribution Date. As indicated above, the outstanding balance on the LLW Notes currently exceeds $900,000. In addition, $200,000 of proceeds from the sale of Ranch 7A are held in escrow. BBB estimates that those funds will be released in by the deadline of December 1, 2011. Finally, if approved, the settlement agreement with LLW provides for the payment of $100,000 to BBB. Reorganized BBB is authorized to retain and pay attorneys and other professionals to the extent it deems reasonable and necessary. Reorganized BBB will conduct its business according to the terms of the Plan and its Operating Agreement. In the event of any inconsistency between the Plan and the Operating Agreement, the Plan will control. A copy of the Operating Agreement is attached as **Exhibit D**. Finally, Reorganized BBB is to file any reports required by the Bankruptcy Code, including post-confirmation quarterly reports, and to file a final report and obtain a final decree when administration of the Chapter 11 Case has been completed.

### C.    The Public Auction

The Plan provides that any remaining real estate owned by the Debtor shall be sold at public auction in 2012 pursuant to Section 1123(a)(5)(d) of the Bankruptcy Code.

(a)     Reorganized BBB will retain an independent auction company with no relationship to the Debtor, its principals or Fifth Third Bank to advertise and conduct the auction.

(b)     A minimum of 120 days will be allowed for advertising in advance of the public auction.

(c)     A duel auction format for the real estate will be used. Initially, bids will be accepted for each of the remaining individual parcels or any combination thereof and a high bidder for each parcel or combination will be designated. Immediately thereafter, bids will be accepted for all of the parcels in a single lot. The sale or sales that yield the greatest aggregate price to the Debtor will be designated as the winning bid.

(d)     Fifth Third Bank's lien interests under the Fifth Third Mortgage will attach to any sale proceeds. Fifth Third Bank will have the right to credit bid up to the full amount of the Allowed Class 2 Claim at the auction of the real estate, but not the Operating Equipment.

(e)     The Chapman Right of First Refusal shall apply according to its terms. The Debtor may request a waiver of the Chapman Right of First Refusal in advance of the public auction.

The net sale proceeds will be applied to Allowed Claims in the priority set forth above. After payment of Allowed Administrative Claims, Allowed Priority Claims, the Allowed Fifth Third Secured Claim and Allowed Convenience Claims, net sale proceeds will be paid into the Creditor Fund for distribution to Allowed Class 5 Claims as set forth herein until all such claims are paid in full, with interest calculated from the Petition Date at the rate of 4% per annum.

## XII.  PROVISION AS TO CONTESTED CLAIMS

Reorganized BBB will file objections to Disputed Claims that it determines are improper, in whole or in part. In addition, Reorganized BBB may, at any time prior to consummation of the Plan, file additional objections to Claims. Upon the filing of such objection or if any Claim is otherwise deemed a Contested Claim under the Plan, such Claim shall be considered a Contested Claim, and any cash or other instruments or property otherwise distributable to such creditor under the Plan shall be held in the Creditor Fund until final disposition of the objection to the Claim. The claim of the Dillard Trust will be treated as a Contested Claim within Class 5, for purposes of the Plan, until it is resolved. Distributions to holders of other Class 5 Claims will only be made after the pro rata portion of any distribution attributed to the claim of the Dillard Trust has been paid into the Creditor Fund. The Creditor Fund will be a segregated, interest bearing, trust account created by the Debtor on or before the Effective Date in which it shall deposit Creditor Payments. If the objection is overruled or denied, in whole or in part, such claimant shall receive the amount of cash or property provided in the Plan to the extent of the amount of the Allowed Claim. No payments or distributions shall be made with respect to all or any portion of any Contested Claim pending the entire resolution thereof by Final Order.

# XIII.  ANALYSIS OF CLAIMS

Under the Bankruptcy Code, a creditor outside of Class 6 may be able to participate in distributions from a bankruptcy estate, whether or not he has filed a Proof of Claim, provided the Debtor has not scheduled the Claim as disputed, contingent, or unliquidated. Accordingly, the Schedules filed by the Debtor will determine the extent of certain classes of Claims. This does not include creditors holding Class 6 Contingent Contractor Claims. You are advised to consult the Schedules and any amendments on file with the Clerk of the Bankruptcy Court to determine if your Claim has been properly scheduled. The Bankruptcy Court has entered an order establishing November 28, 2010 as the bar date for filing proofs of claim.

As of the date of this Disclosure Statement, the following is the Debtor's opinion and estimate of the ultimate amount of the Allowed Claims in the Bankruptcy Case, after the adjudication of the objections, and the amount that will be distributed to the Creditors. The Debtor's opinion is based upon its knowledge of the Claims reflected in the Debtor's Schedules, proofs of claim filed on or before the claim bar date, the potential objections to certain of those Claims and the estimated future revenues to be generated from the Debtor's operations. It is important to note that these are only the Debtor's estimates, and there is no assurance that the amount of Allowed Claims will not exceed the estimate, or that the amount realized from the assets will not be less than the estimate.

Under Scenario 1, it is assumed that the Debtor will be successful in its appeal of the Dillard Litigation and it will be determined that there is no obligation to the Dillard Trust under the Put Option Contract. Under Scenario 2, it is assumed that the District Court's ruling in the Dillard Litigation will be upheld on appeal and that all amounts claimed by the Dillard Trust are eventually awarded. The Dillard Trust has filed a Proof of Claim in the Debtor's bankruptcy proceeding asserting a total claim in the total amount of $17,253,502 of which it asserts $10 million to be secured. This figure includes an additional $1,000,000 for the Put Option Contract exercise price, pre-judgment interest in the amount of $1,498,765.91 and attorneys' fees and costs in the amount of $510,633.23. These additional amounts were not awarded by the District Court. Rather, these amounts reflect what the Dillard Trust will seek on appeal to the Tenth Circuit. If the Dillard Trust prevails in asserting these additional claims, the Debtor estimates that the Class 3 Claim would be increased to $10 million, while Class 5 Claims would be increased by $1,498,765.91 in pre-judgment interest and $510,633.23 in attorneys' fees and costs.

|         |                         | Scenario 1      | Scenario 2      |
|---------|-------------------------|-----------------|-----------------|
| Class 1 | General Priority Claims | $0.0            | $0.0            |
| Class 2 | Fifth Third Bank        | $21,300,343.27  | $21,300,343.27  |
| Class 3 | Dillard Trust           | $0.0            | $10,000,000     |
| Class 4 | Convenience Claims      | $6,225          | $6,225          |

{00974247 / 1}

| Class 5 | General Unsecured Claims | $713,795 | $7,967,297[1] |
| Class 6 | Contingent Contractor Claims | $0 | $0 |

## XIV.  ALTERNATIVES TO THE PLAN AND LIQUIDATION ANALYSIS

The alternatives to the Plan are conversion of the Chapter 11 Case to a Chapter 7 proceeding or dismissal. The Debtor believes that a structured and orderly sale of its assets under Chapter 11 represents the best opportunity to pay creditors in full. The Debtor believes that sale of its assets through this Plan is preferable to conversion to Chapter 7.

The Debtor's Plan provides the best opportunity for all Allowed Claims to be paid in full. In the event the case is converted to a Chapter 7 proceeding, creditors would receive only the liquidation value of the Debtor's assets. The Debtor believes that the sale of its real estate under these circumstances will be at severely reduced prices and will not likely exceed the amount owed to secured creditors and therefore no equity will exist to pay any amounts to unsecured creditors. In Tim Bradley's appraisal report of November 2009, offered by the Dillard Trust during the Dillard Litigation, it is estimated that a "forced sale" of Ranches 1A and 1B within forty-five days of placing them on the market would result in a discount from fair market value of 35%. His opinion was based on 29 responses to a telephone survey of real estate agents/brokers and appraisers in the Teton County area. According to BBB's listing broker, two large parcels located near Kelly, Wyoming (approximately 5 miles west of the Jackson Hole Airport) were sold in 2010 at public auction. Each of the two parcels brought less than 50% of the original listing price at auction. For purposes of its liquidation analysis, BBB has assumed that its remaining parcels would sell for approximately 50% of listing price at auction. Even if sale proceeds exceed secured claims, the amount available for distribution to unsecured creditors will be reduced by the Chapter 7 trustee fees allowed under Section 326 of the Bankruptcy Code, in addition to any professional fees incurred by the trustee and any outstanding Chapter 11 administrative expenses. In addition, to the extent that the Chapter 7 estate would likely be illiquid, it is possible that the Trustee would not have the ability to pursue the appeal in the Dillard Litigation, thus jeopardizing collection on the judgment against Dillard. Without the ability to perform the remaining obligations with respect to the sale of Ranch 7A, the $200,000 held in escrow would likely be forfeited. It is not likely that additional payments would be made on the LLW Notes. Finally, the Debtor's equipment will likely be sold at a significant discount in the event it is liquidated by a Chapter 7 trustee.

The following is the Debtor's estimate of the results of the liquidation of the Debtor's assets, in the event the case is converted to Chapter 7:

---

[1] This figure includes the amount by which the total reflected on the Dillard Trust's amended proof of claim exceeds the alleged $10 million value of Ranches 1A and 1B.

Assets (as of July 31, 2011)

|  | Balance Sheet | Liquidation Value |
|---|---|---|
| Cash | $125,625 | $0 |
| Real Property (Book Value) | $36,865,383 | $22,000,000 |
| Notes Receivable – LLW | $909,471 | $0 |
| Dillard Note Judgment | $1,092,452 | $0 |
| Equipment (net of depreciation) | $77,656 | $10,000 |
| Hansen Escrow | $200,000 | $0 |
| TOTAL VALUE | $39,270,587 | $22,010,000 |

## XV.   RISK FACTORS

The principal risks associated with the Plan have to do with the ability of the Debtor to continue operations and sell its remaining real estate at prices sufficient to pay Allowed Claims. Success under the Plan does not depend on a positive outcome on the appeal of the Dillard Litigation. However, the outcome of these disputed matters will have a significant impact on the amount of time necessary to satisfy the Class 3 Claim and complete payments to all Creditors.

As indicated above, the Debtor's business is based on the ability to sell real estate. The Debtor's field is competitive and dependent on market conditions. Continued stagnation in the luxury real estate and second home market would obviously have an adverse impact on revenues and profitability during such period.

The Debtor has made no assumption regarding the potential outcome of its appeal of the Dillard Litigation. It is possible that the Dillard Trust's judgment against the Debtor could be upheld on appeal or, to the extent that the Debtor prevails, that the Dillard Trust could also prevail on its cross-appeal.

## XVI.   TAX CONSEQUENCES

Reorganized BBB will continue as a limited liability company, being taxed as a partnership for federal income tax purposes. Reorganized BBB shall have the right, but not the obligation, to file a ruling request with, or otherwise seek guidance or advice from, the Internal Revenue Service or tax counsel as to the proper federal income tax classification and treatment of Reorganized BBB and, upon receipt of such guidance, shall file the appropriate federal, state, and local income tax returns, provide creditors with the appropriate information returns and, in accordance with such guidance or advice, pay from the income of Reorganized BBB (to the extent that it is subject to income taxation) any federal, state, or local income tax attributable to the earnings of Reorganized BBB. At the present time, Reorganized BBB has no intention of filing a ruling request. Absent receipt of such guidance or advice, Reorganized BBB shall be entitled:

(a)     to assume that Reorganized BBB is a limited liability company with the tax attributes specified under Subchapter K of the Internal Revenue Code of 1986, as amended (the "IRC"), with each Creditor subject to individual tax treatment that is determined solely upon their respective form of organization and the corresponding tax characterization associated with that form under the IRC and the regulations issued thereunder; and

(b)     to file all appropriate federal, state, and local income tax returns, and provide the members and, where necessary, creditors with information statements in accordance with such assumptions.

The taxable year of Reorganized BBB shall, unless otherwise required by the IRC, be the calendar year.

**Reorganized BBB will make distributions to creditors based upon the terms of the Plan. The tax attributes of those distributions will depend upon each individual creditor's tax treatment. Therefore, the characterization of the distribution as ordinary income, short or long term capital gain, or exempt from income tax, depends completely upon the individual creditors' tax status.**

As is evident from the foregoing, the Plan and its related tax consequences are complex. Moreover, many of the Tax Code provisions dealing with the federal income tax issues arising from the Plan are the result of recent legislation and, consequently, may be subject to administrative or judicial interpretations that differ from the discussion below. The Debtor has not requested a ruling from the Internal Revenue Service (the "IRS") or an opinion of counsel with respect to these matters. Accordingly, no assurance can be given that the IRS will agree with the conclusions set forth in this Disclosure Statement. **CREDITORS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE, LOCAL, AND OTHER TAX LAWS.**

The federal income tax consequences of the Plan to holders of Unsecured Claims will depend, among other things, on the following: the origin of the holder's Claim, when the Claim becomes an Allowed Claim, when the holder receives payment in respect of his Allowed Claim, whether the holder reports income using the accrual or cash method of accounting, whether the holder has taken a bad debt deduction or worthless security deduction with respect to his Claim, and whether the Claim constitutes "securities" for federal income tax purposes. An Unsecured Creditor will generally recognize income, gain, or loss equal to the difference between the adjusted basis of the Claim and the amount realized pursuant to the Plan. The characterization of such income, gain, or loss depends on several factors, including those listed in this paragraph.

Under the backup withholding rules of the IRC, holders of Unsecured Claims may be subject to backup withholding at the rate of twenty percent (20%) with respect to payments made pursuant to the Plan unless such holder either (i) is a corporation or comes within certain other

exempt categories and, when required, demonstrates this fact, or (ii) provides a correct taxpayer identification number and certifies under penalties of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividends and interest income. Any amount withheld under these rules will be credited against the holder's federal income tax liability. Reorganized BBB may require holders of Unsecured Claims to establish exemption from backup withholding or to make arrangements satisfactory to Reorganized BBB with respect to the payment of backup withholding.

**THE FOREGOING IS INTENDED ONLY AS A SUMMARY OF CERTAIN FEDERAL INCOME TAX ASPECTS OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM. HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE PLAN.**

## XVII.  VOTING PROCEDURES IN A CHAPTER 11 PLAN

Chapter 11 of the Bankruptcy Code permits the adjustment of secured debts, unsecured debts and equity interests. A Chapter 11 plan may provide less than full satisfaction of senior indebtedness and payment of junior indebtedness or may provide for return to equity owners, absent full satisfaction of indebtedness so long as no impaired class votes against the Plan.

If an impaired class votes against the Plan, this does not necessarily make implementation of the Plan impossible so long as the Plan is fair and equitable, that class is afforded certain treatment defined by the Bankruptcy Code, and at least one impaired class of creditors votes to accept the Plan by a two-thirds majority in the dollar amount of Claims voting and a majority in number of Claims voting. In order to be fair and equitable with respect to the Unsecured Creditors, the Plan must either provide the creditor the full value of his Claim or, if he does not receive the full value of the Claim, no junior class of creditor may receive or retain anything on account of their Claim or interest.

In the event a class is unimpaired, it is automatically deemed to accept the Plan. A class is unimpaired if: (i) its rights after confirmation are the same as they existed (or would have existed absent defaults) before the commencement of the Chapter 11 Case and any existing defaults are cured or provided for and the class is reimbursed actual damages; or (ii) the Allowed Claims of the class are paid in full in cash as though matured.

If there is no dissenting class, the test for approval by a court of a Chapter 11 Plan (*i.e.*, Confirmation) is whether the plan is in the best interests of creditors and is feasible. In simple terms, a plan is considered by the Court to be in the best interests of creditors if the plan will provide a recovery to the creditors of not less than they would obtain if the Debtor was liquidated and the proceeds of liquidation were distributed in accordance with the bankruptcy liquidation (Chapter 7 priorities). In this case, the unsecured creditors will receive not less, and likely more, under the Plan than they would receive in a liquidation proceeding and it is anticipated that all

senior classes of creditors are either unimpaired or have agreed to different treatment under the Plan.

These determinations by the Court will occur at the hearing on Confirmation after a Plan has been accepted by the creditors. The Court's judgment on these matters does not constitute an expression of the Court's opinion as to whether the Plan is a good one.

While the Plan provides for certain payments on the Distribution Date, such payments will only apply to Allowed Claims. Under the Bankruptcy Code, a Claim may not be paid until it is Allowed. A Claim will be Allowed in the absence of objection. A Claim which has been objected to will be heard by the Court at a regular evidentiary hearing and allowed in full or in part or disallowed. While the Debtor bears the principal responsibility for claims objections, any interested party, including creditors, may file claim objections. Accordingly, payment of some Claims may be delayed until objections to such Claims are ultimately settled.

## XVIII. GENERAL PROVISIONS

Reorganized BBB shall be vested with ownership to all property of the estate upon the Effective Date.

On the Effective Date of the Plan, the Debtor intends to assume the Chapman Right of First Refusal. All unexpired leases and executory contracts between the Debtor and any other party (if any) that have not, prior to the Effective Date of the Plan, been affirmatively assumed by the Debtor, are rejected under the Plan.

The Bankruptcy Code requires disclosure of certain facts. There are no payments made or promises of the kind specified in Section 1129(a)(4)(A) of the Bankruptcy Code which have not been disclosed to the Court.

Nothing in the Plan shall prevent Reorganized BBB from taking any action as may be necessary to the enforcement of any cause of action which may exist on behalf of the Debtor and which may not have been enforced or prosecuted by the Debtor prior to the Effective Date. The Debtor reserves the right to modify the Plan prior to Confirmation, and thereafter the Reorganized BBB may modify the Plan in accordance with 11 U.S.C. § 1127(b).

## XIX. CONCLUSION

The materials provided in this Disclosure Statement are intended to assist you in voting on the Plan in an informed fashion. Since, if the Plan is confirmed, you will be bound by its terms, you are urged to review this material and make such further inquiries as you may deem appropriate and then cast an informed vote on the Plan. The Debtor submits that the Plan complies in all respects with Chapter 11 of the Bankruptcy Code, is fair and equitable as to all parties, and provides a greater return than creditors would likely receive under any reasonable alternative. Therefore, the Debtor encourages that all creditors entitled to vote on the Plan vote to accept it.

{00974247 / 1}                                   25

DATED this 20th day of September, 2011.

BBB ACQUISITION, LLC


/s/ Mercer Reynolds III
Mercer Reynolds III, Managing Member

ROTHGERBER JOHNSON & LYONS LLP

By: /s/ Brent R. Cohen
Brent R. Cohen, Wyo. Reg. No. 5-2008
Chad S. Caby, Admitted Pro Hac Vice
1200 17th Street, Suite 3000
Denver, CO 80202-5855
Telephone:    303.623.9000
Facsimile:    303.623.9222
E-mail:    bcohen@rothgerber.com
           ccaby@rothgerber.com

Counsel for BBB Acquisition, LLC